# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 3, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | |
| **ABUL HUDA FAROUKI,** | : | **18 U.S.C. § 1031(a)** |
| **MAZEN FAROUKI,** | : | (Major Fraud Against the United States) |
| **and SALAH MAAROUF,** | : | |
| | : | **18 U.S.C. § 2** |
| **Defendants.** | : | (Aiding and Abetting, Causing an Act to |
| | : | be Done) |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | (Conspiracy to Violate IEEPA) |
| | : | |
| | : | **18 U.S.C. § 1956(a)(2)(A)) and (h)** |
| | : | (International Money Laundering) |
| | : | |
| | : | **18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | (Criminal Forfeiture) |

Case: 1:18-cr-00346
Assigned To : Judge Trevor N. McFadden
Assign. Date : 11/27/2018
Description: INDICTMENT (B)

## INDICTMENT

The Grand Jury charges that:

### General Allegations

At all relevant times to this Indictment, unless otherwise stated:

### Relevant Entities

1.     Anham FZCO ("Anham") was a corporation founded in 2004 in Dubai, United

Arab Emirates ("UAE").  Anham maintained associated offices in Dubai, Jordan and the United

States.

2.      Anham U.S.A., Inc. ("Anham U.S.A."), formerly Nour U.S.A., was a corporation formed in the Commonwealth of Virginia in May, 2003 that provided training, project management, logistics, supply, and warehousing services, including to the U.S. government pursuant to contracts awarded to Anham.

3.      Unitrans International Incorporated ("Unitrans") was a corporation formed in the Commonwealth of Virginia that provided international logistics services, including arranging implementing, facilitating, and managing the international movement of cargo for Anham.

4.      Tracks International ("Tracks") was a corporation formed in Jordan in or about 2009 with its headquarters in Amman, Jordan, which provided logistics services. Tracks was 80% owned by Anham and 20% owned by Unitrans. In 2011 and 2012, Tracks had a management agreement with Unitrans in which Unitrans provided management services to Tracks in return for a percentage of Tracks' revenue. Some Tracks and Unitrans employees had email addresses at both companies. The president of Tracks was a vice president of the Unitrans affiliate in Afghanistan.

5.      American International Services ("AIS") is a subsidiary of the holding company that owns Unitrans. AIS purchased goods and services for Anham.

6.      Transshipper #1 is a transportation company headquartered in Dubai, UAE

7.      Transshipper #2 is a transportation company headquartered in Mersin, Turkey.

8.      The Defense Logistics Agency ("DLA") is an agency of the United States. It is the Department of Defense's ("DoD") largest logistics combat support agency, providing worldwide logistics support in both peacetime and wartime to the military-service branches as well as several civilian agencies and foreign countries.   DLA Troop Support ("DLATS") is a sub-agency of DLA

and supports DoD through five supply chains: subsistence, clothing and textiles, construction and equipment, medical, and industrial hardware.

9.     The Bagram Regional Contracting Center ("BRCC") is a DoD contracting office located at Bagram Airfield, Afghanistan.  The BRCC solicited bids and proposals and awarded U.S. Army contracts in Afghanistan.

### The Defendants

10.     ABUL HUDA FAROUKI, a United States citizen, was the Chief Executive Officer of Anham and Anham U.S.A.  Through a holding company, ABUL HUDA FAROUKI held an ownership interest in Unitrans and also owned 50% of Anham U.S.A. and 25% of Anham. All of the employees of Anham, Anham U.S.A., and Unitrans ultimately reported to him.

11.     MAZEN FAROUKI, a United States citizen, was the founder and President of Unitrans through 2014 and was also the president of Unitrans Afghanistan, Unitrans' Afghan affiliate.  MAZEN FAROUKI is the brother of ABUL HUDA FAROUKI.

12.     SALAH MAAROUF, a United States citizen, operated AIS.

### The SPV-A Contract

13.     On or about April 26, 2011, DLATS solicited bids on a contract to supply food and other subsistence items for U.S. troops in Afghanistan.  That contract was known as the Subsistence Prime Vendor – Afghanistan ("SPV-A") contract.  DLATS' solicitation set forth that the successful contractor must, among other things, provide warehouses in Afghanistan that could store very large amounts of both refrigerated and dry goods.  DLATS's solicitation also noted that a prospective contractor must "clearly address within their proposal whether construction is contingent upon award . . . or ongoing," and that "[i]f some aspects of construction are ongoing, while others are contingent, this must be clearly differentiated."  The SPV-A was a "fixed price"

contract awarded at approximately a total of $8 billion, which was set to run for a term of 66 months.

14.     The United States Treasury Department, at the direction of the President, pursuant to his authority under the International Emergency Economic Powers Act ("IEEPA"), implemented regulations against the Islamic Republic of Iran, entitled the Iranian Transactions and Sanctions Regulations,[1] codified Part 560 (the "ITSR"). Among other things, the ITSR prohibited U.S. persons from shipping materials to or through Iran and from approving, financing, facilitating, or guaranteeing any transaction by a foreign person where the transaction by that foreign person would be prohibited if performed by a United States person. 31 C.F.R. §§ 560.203, 204, 206, 208, and 403. The SPV-A solicitation required a bidder to certify that it, and any person owned or controlled by the bidder, would abide by all U.S. laws in general; and, specifically, agreed to abide by Title 48 CFR 52.225-13 which states:

> "(a) Except as authorized by the Office of Foreign Assets Control (OFAC) in the Department of the Treasury, the Contractor shall not acquire, for use in the performance of this contract, any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States.
>
> (b) Except as authorized by OFAC, most transactions involving Cuba, Iran, and Sudan are prohibited, as are most imports from Burma or North Korea, into the United States or its outlying areas. Lists of entities and individuals subject to economic sanctions are

---

[1] The ITSR was originally known as the ITR. It was re-named the ITSR in or around October, 2012. The regulations will be referred to as the ITSR herein.

included in OFAC's List of Specially Designated Nationals and Blocked Persons at *http://www.treas.gov/offices/enforcement/ofac/sdn.*

15.    Additionally, the SPV-A contract incorporated the ITSR by reference and required successful bidders to certify that they would comply with all executive orders, proclamations and statutes administered by the Office of Foreign Assets Control ("OFAC"), of the United States Department of the Treasury, which included the ITSR.  The contract also required the successful bidders to comply with, and to ensure that their personnel, subcontractors, and their employees, at all tiers, were aware of and complied with, all U.S. and Host Nation laws, federal or DoD regulations, and U.S. Central Command orders and directives applicable to personnel in Iraq and Afghanistan, which included the ITSR.

16.    On or about July 11, 2011, Anham submitted a proposal on the SPV-A contract that represented that Anham would build two warehouses on a complex near Bagram Airfield to meet the SPV-A solicitation requirements. Anham's bid represented that the warehouses would be completed by late December, 2011.  As part of its proposal, Anham certified that it would not violate OFAC regulations.

17.    Following a competitive bidding process, DLATS awarded the SPV-A contract to Anham on or about June 22, 2012.  On or about June 22, 2012, D.B., the Anham Managing Director, signed the SPV-A contract on behalf of Anham.  The box certifying compliance with the ITSR was checked on the contract that D.B. signed.

### The NAT Contract

18.    On or around February 22, 2011, DoD, acting through the BRCC, solicited bids on the National Afghan Trucking ("NAT") contract, to supply trucking services for the U.S. military in Afghanistan.  The contract required the successful bidder, among other things, to have a

significant number of trucks and trailers in Afghanistan. The BRCC awarded multiple task order contracts under the NAT contract totaling approximately $984 million. During the years 2011 and 2012, the NAT award was the largest in Afghanistan theater history.

19.    The NAT contract incorporated the ITSR by reference and required the successful bidder to certify that it was in compliance with OFAC regulations which included the ITSR by checking a box on the contract that referenced them. The NAT contract also incorporated provisions that required the successful bidder to comply with and to ensure that its personnel, its subcontractors, and their employees, at all tiers, were aware of and complied with, all U.S. and Host Nation laws, federal or DoD regulations, and U.S. Central Command orders and directives applicable to personnel in Iraq and Afghanistan, which included the ITSR.

20.    On or about February 7, 2012, the BRCC awarded part of the NAT contract to Anham in the amount of approximately $423 million for a base term of 12 months with two 12 month options. On or about February 11, 2012, D.B. signed the NAT contract on behalf of Anham. The box certifying compliance with OFAC regulations including the ITSR was checked on the contract that D.B. signed.

### COUNT ONE
### Major Fraud Against the United States
### (18 U.S.C. §§ 1031(a) and 2)

21.    Paragraphs 1 through 17 of this Indictment are re-alleged and incorporated by reference as if set out in full.

22.    From in or around November 2011 and continuing to in or about May 2015, in the District of Columbia, the defendants, ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF, and others, known and unknown to the Grand Jury, in the procurement of property and services as a prime contractor on a contract with the United States with a value in

excess of $1,000,000, did knowingly execute a scheme and artifice with the intent: (a) to defraud

the United States; and (b) to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises.

## Purpose of the Scheme and Artifice

23.     It was the purpose of the scheme and artifice for the defendants and others to

unlawfully enrich themselves by winning the award of the SPV-A contract, by making material

false and fraudulent statements to DLATS and by shipping construction materials and associated

containers through Iran and by shipping the empty containers back through Iran in violation of

OFAC regulations including the ITSR, and the portion of the SPV-A contract that incorporated

the OFAC regulations including the ITSR, to reduce Anham's overhead costs associated with the

SPV-A contract.

## The Scheme and Artifice to Defraud

24.     On or about July 13, 2011, and in response to DLATS' SPV-A contract solicitation

requiring that prospective contractors demonstrate their capability of performing the contract by

specifying how they would have suitable warehouse facilities in Afghanistan capable of storing

frozen and dry goods, the defendants caused Anham to represent in its bid proposal to DLATS that

Anham was in the process of "constructing a state-of-the-art warehouse complex" near Bagram

Airfield in Afghanistan, and that construction of the facility would be complete by December,

2011.

25.     Throughout the bidding process on the SPV-A contract, ABUL HUDA FAROUKI,

and SALAH MAAROUF, and others, deceived DLATS by making numerous misrepresentations

to DLATS regarding their intention to build compliant warehouses at the proposed Bagram

warehouse complex, and also by misrepresenting the construction status of the warehouses by

7

submitting to DLATS photographs of a construction site that was deceptively staged to appear as if Anham had made meaningful progress on the completion of the warehouses.

a.     ABUL HUDA FAROUKI and other Anham employees knew that on or about December 1, 2011, little construction work had taken place on the Bagram warehouse complex—specifically, that "holes [were] dug and concret[e] [was] poured for the base of the supporting columns" for the first warehouse, that there was "no visible structure" for the first warehouse and that "no work whatsoever" had been done on the second warehouse.   ABUL HUDA FAROUKI, SALAH MAAROUF and other Anham employees also knew that engineers believed May 2012 to be an "[o]ptimistic completion date" for the construction of the Bagram warehouse complex.

b.     ABUL HUDA FAROUKI and other Anham employees knew that as of on or about December 2, 2011, in the words of a part owner of Anham, Anham was only authorizing the construction of two "shells of a warehouse without any cold storage equipment, racking . . . [,] or major external site works," and that the additional work would not be authorized "until a clear intention of an award" because the work would cost "an additional 4-6 million dollars per warehouse," which Anham was "not prepared to commit to at this stage."

c.     Despite having made little progress with construction at the Bagram warehouse facility—and with no intention to fully construct a compliant warehouse complex prior to contract award—the defendants caused D.B., on behalf of Anham, to submit a letter to DLATS on or about December 7, 2011, falsely representing that "major construction activities" for the Bagram warehouse complex commenced at "the beginning of November 2011," and that "[t]he key metric is that the Bagram Farm warehouse . . . will be fully completed and operational more than a month and a half before" initial performance was required under the SPV-A contract,

assuming that Anham received authorization from DLATS to proceed on the contract by the end of January 2012. D.B. then falsely represented in the December 7, 2011 letter, as well as in a December 21, 2011 letter, that construction of the Bagram warehouse complex would be complete on or around February 28, 2012.

   d. On or about February 2, 2012, DLATS requested that Anham provide updates to construction timelines and photographs demonstrating progress with construction by on or about February 6, 2012. Because Anham had done little construction as of February 2, 2012, ABUL HUDA FAROUKI and other top managers of Anham held a meeting during which the participants agreed to deceive DLATS by creating the appearance of a busy construction site with meaningful progress being made on the warehouses.

   e. Between on or about February 3, 2012, and February 6, 2012, the defendants and others caused Anham employees and others working at the direction of Anham to transport construction equipment, prefabricated sheds, generators, empty shipping containers and a construction crane to the site of the proposed Bagram warehouse complex to create the false appearance of an active construction site. In addition, because the high-grade steel being transported through Iran had yet to arrive and suitable local steel had not yet been purchased, Anham employees purchased steel columns of a lesser size than had been planned from an Afghan vendor so that Anham employees could construct a row of columns intended to look like a warehouse frame. The defendants then directed an Anham employee to photograph the staged construction site. The staged site then was deconstructed after the photographs had been taken.

   f. On or about February 6, 2012, D.B., with the knowledge of the defendants, provided DLATS with the photographs, along with a status report containing several misrepresentations about the work that had been completed on site—specifically, that Anham was

"in substantial conformance with [its] previous construction plans and schedule," other than an approximately 10-day delay in performance, and that "[t]he photographs are demonstrative of," among other things, "[s]teel support columns . . . being erected as per the schedule." With the knowledge of the defendants, D.B. also stated to DLATS on or about February 6, 2012, that "All pre-manufactured building materials in the supply chain have either arrived on site or are on transports and will arrive shortly." It was known to defendants at that time that none of the pre-manufactured building materials had arrived on site.

26.     On or about February 13, 2012, DLATS employees met to discuss the various bid proposals for the SPV-A contract.  As a result of that meeting, DLATS drafted the "Source Selection Advisory Council Recommendation," and the report was finalized on or about March 23, 2012.  The final report noted that while "Anham does represent some heightened risk arising out of the fact that the infrastructure . . . is only partly in place," the committee "became more comfortable . . . as Anham has addressed that concern with pictures of progress." The committee then concluded that Anham could "successfully perform the contract requirements," and the committee ultimately recommended that Anham receive the SPV-A contract.

27.     As required by the solicitation for the SPV-A contract, D.B., as Managing Director of Anham, certified as part of its proposal that as a contractor, Anham would not violate any provision of the OFAC regulations including the ITSR.  During the bidding process and both before and after the award of the SPV-A contract on or about June 22, 2012, however, the defendants knowingly engaged in, and directed others to engage in, the practice of shipping goods and materials across Iran, in violation of the OFAC regulations including the ITSR, while concealing their scheme from DLATS and the Treasury Department's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia. Anham also engaged in the practice of

dealing in, in the performance of the SPV-A contract, goods and materials which had been shipped across Iran in violation of OFAC regulations, making such goods and materials goods of Iranian origin, and making their use a violation of OFAC regulations.

28.     When Anham submitted its bid proposal on the SPV-A contract, it submitted a list of vehicles it would use to perform the contract. Included in that list were trucks and trailers that the defendants had caused Anham to ship across Iran to Afghanistan between on or about 2009 and on or about 2010, in violation of OFAC regulations including the ITSR.

29.     In addition, beginning in or about November 2011, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF, separately, together, and with others, routinely discussed in internal communications the transshipment of warehouse components through Iran, for the purpose of saving time and decreasing the need to expend costs for the project prior to the awarding of the SPV-A contract. Then, between on or about January 2012 and on or about July 2012, the defendants caused and paid Transshipper #1 and Transshipper #2 to ship the steel components of the Bagram warehouse and other warehouse components in containers across Iran en route to Afghanistan and to ship the empty containers back across Iran, all in violation of OFAC regulations including the ITSR, as follows:

a.     In an email chain that occurred on or about December 7-8, 2011, an employee of Anham advised an employee of Unitrans that Anham's efforts to ship steel to Afghanistan for the purpose of building a warehouse were frustrated by the fact that Pakistan had closed its border crossing and that Unitrans and Anham needed to find alternatives. The Unitrans employee responded: "Mazen suggested to Huda that we transport through Iran. He is working on this." The Unitrans employee then forwarded the email exchange to MAZEN FAROUKI, who responded "noted."

11

b.      On or about December 9, 2011, an executive of Unitrans solicited information from others at Unitrans and Anham for information on agents currently transporting goods across Iran.

c.      In response to a December 12, 2011 email chain discussing Anham's plan to ship materials through Iran, an employee of Anham wrote: "can you please take me off the emails. I am neither interested nor concerned with shipments going through Iran." An employee of Unitrans then replied: "how many times do we need to request to remove the mentioning of a specific country in all emails. STOP that mentioning please IMMEDIATELY."

d.      In an email dated on or about December 15, 2011, SALAH MAAROUF informed ABUL HUDA FAROUKI that Anham had the option of avoiding transit through Iran by shipping materials to Afghanistan via air freight, but that air freight would be far more expensive than sending the materials through Iran.   SALAH MAAROUF then forwarded this email to MAZEN FAROUKI who then emailed ABUL HUDA FAROUKI to suggest using airfreight to send just five containers of steel to Kabul for about $200,000.  ABUL HUDA FAROUKI responded: "not necessary."

e.      In an email dated on or about December 18, 2011, in response to a request by the head of Tracks for authorization to ship through Iran, MAZEN FAROUKI advised a Unitrans employee that "it has been decided by 'all' that we use two routes . . via Karachi [Pakistan] [and] Via Bandar Abbas [Iran]."

f.      On or about December 20, 2011, employees of Tracks notified Transshipper #1 that Anham was ready to enter into contracts for the shipments to Afghanistan for which Anham had previously sought quotes and that they hoped to be able to start getting containers onto ships by January, 2012.

12

g.　　　Between on or about December 20 and December 27, 2011, Tracks employees sought and received additional quotes from shipping companies to compare the costs of shipping containers from Riyadh, Saudi Arabia to Kabul through Bandar Abbas, Iran with the costs of shipping through Pakistan. Tracks employees forwarded the information to MAZEN FAROUKI and SALAH MAAROUF.

h.　　　On or about January 7, 2012, defendant SALAH MAAROUF emailed employees of Unitrans, Tracks, and Anham USA. The email was headed "Containers through Bandar Abbas" and asked for advice on what documents were required for such shipments.

i.　　　On or about February 2, 2012, Unitrans sent a wire transfer for approximately $51,319 from its account at PNC Bank in the United States to Transshipper #1's account at Abu Dhabi Commercial Bank in the United Arab Emirates ("UAE") to pay an invoice for the shipment of five containers from Riyadh, Saudi Arabia, to Bandar Abbas, Iran, en route to Afghanistan.

j.　　　On or about February 14, 2012, Unitrans sent its invoice numbered 9107 to defendant Anham for reimbursement for the $51,319 Unitrans had sent to Transshipper #1.

k.　　　On or about February 14, 2012, Unitrans sent a wire transfer for approximately $52,876 from its account at PNC Bank in the United States to Transshipper #1's account at Abu Dhabi Commercial Bank in the UAE to pay an invoice for the shipment of five additional containers from Riyadh, Saudi Arabia to Bandar Abbas, Iran, en route to Afghanistan.

l.　　　On or about February 14, 2012, Unitrans sent its invoices numbered 9108 and 9111 to Anham for reimbursement for the amount of $52,876 Unitrans had sent to Transshipper #1.

m.    In an email dated on or about March 5, 2012, an Anham employee advised MAZEN FAROUKI and others that shipping material through Iran would jeopardize Unitrans's relationship with its bank: "the other alternative of shipping route as I was told is thru Iran and this solution will put Anham in trouble with the bank and accordingly they will not accept the shipping documents they will reject to pay for the [letter of credit]."

n.    On or about April 8, 2012, Unitrans sent its invoice numbered LC-18 to Anham for reimbursement for approximately $306,114.34 Unitrans had sent to Transshipper #1 for various expenses, including ocean shipping 24 containers from Saudi Arabia to Bandar Abbas, Iran, en route to Afghanistan.

o.    On or about April 30, 2012, Anham wire transferred approximately $306,114.34 for payment of Unitrans invoice LC-18 from its account at Arab Bank in Bahrain to Unitrans' account at PNC Bank in the United States for reimbursement of invoices paid by Unitrans to Transshipper #1 for ocean shipping from Saudi Arabia to Bandar Abbas, Iran.

p.    On or about May 30, 2012, Anham wire transferred $376,714.19 from its account at the Bank of Georgetown in the District of Columbia to Unitrans.  The payment was reimbursement to Unitrans for: (1) payments by Unitrans to Transshipper #2 for invoices related to containers shipped through Iran; and (2) to another company for land transportation of containers, which had been moved across Iran, from the Afghan border to Kabul or Bagram.  The wire transfer was sent to the same account from which Unitrans had paid Transshippers #1 and #2 for its services in transporting goods across Iran.

30.    On or about June 22, 2012, on behalf of Anham, D.B. signed the SPV-A contract, which represented that Anham agreed to comply with OFAC regulations including the ITSR.  As of June 22, 2012, ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF then

and there well knew that Anham and Unitrans had already transshipped, and continued to transship, materials associated with the SPV-A contract, including many of the components of the warehouse in Bagram through Iran and that Anham was dealing in and was planning to continue to deal in goods of Iranian origin, in violation of OFAC regulations, including the ITSR.

31.     After being awarded the SPV-A contract, and despite full knowledge of Anham engaging in activities that violated OFAC regulations including the ITSR, ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF made numerous misrepresentations to DLATS for the purpose of covering up their involvement in the fraudulent scheme, including the following:

a.      On or about September 12, 2013, D.B., on behalf of Anham, submitted a letter to the United States Department of Commerce in the District of Columbia stating that the company had recently discovered that it had transshipped material through Iran. In fact, Anham's leadership, including ABUL HUDA FAROUKI, had known since late 2011 that Anham had been shipping goods and materials through Iran.

b.      On or about September 12, 2013, during a meeting in Baku, Azerbaijan, an Anham executive represented to DLA Official # 1, who was at that time the top official in charge of DLATS, that Anham had not transshipped goods through Iran, when Anham executives then and there well knew that this statement was false.

c.      On or about September 23, 2013, Defendant ABUL HUDA FAROUKI sent an email to DLA Official # 2, who was the head of DLA, informing him that the Wall Street Journal was about to publish a story about Anham's shipments of warehouse components and trucks across Iran. The email claimed falsely that senior management at Anham had not had any knowledge of the transshipments at the time they took place, when in fact senior management had

not only known about the transshipments but had made the decision to transship and had organized the activity.

   d. On or about September 27, 2013, the day after the Wall Street Journal reported that Anham had transshipped goods through Iran, ABUL HUDA FAROUKI made the following representation to DLA Official # 2, which ABUL HUDA FAROUKI then and there well knew to be false: "based on the current state of the investigation, Anham estimates that approximately four out of some fifty shipments for the warehouse materials may be involved, during the period when the Pakistan border was closed as these shipments were originally destined for Pakistan. . . Top management at Anham had no knowledge of these shipments and upon learning of this possibility made a voluntary disclosure to the U.S. government that Anham was investigating whether any violations had in fact occurred."

   e. On or about October 1, 2013, following the Wall Street Journal report, ABUL HUDA FAROUKI made the following representation in an email to DLA Official # 2, which ABUL HUDA FAROUKI then and there well knew to be false: "it appears that the foreign employee was correct about the legality [of the transshipment], but obviously, top management would never have permitted that decision had we known for a host of reasons. . . no shipments are ever permitted through Iran and that is formal company policy."

   f. On or about June 26, 2014, Unitrans, through its agents, submitted a letter to the United States Department of Commerce Bureau of Industry and Security Office of Export Enforcement ("BIS") in the District of Columbia asserting that a disclosure that the company made in September 2013 came "days after finding out about the potential violations." MAZEN FAROUKI certified this letter on behalf of Unitrans despite his having known of the transshipments and their illegality for over a year.

## COUNT TWO
### Major Fraud against the United States
### (18 U.S.C. §§ 1031(a) and 2)

32.     Paragraphs 1-13, 15-16, 18-20 and 28-31 of this Indictment are re-alleged and incorporated by reference as if set out in full.

33.     From in or around April 26, 2011 and continuing to on or about October 1, 2013, in the District of Columbia, the defendants, ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF, and others, known and unknown to the Grand Jury, in the procurement of property and services as a prime contractor on a contract with the United States with a value in excess of $1,000,000, did knowingly execute a scheme and artifice with the intent: (a) to defraud the United States; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### Purpose of the Scheme and Artifice

34.     It was the purpose of the scheme and artifice for the defendants and others to unlawfully enrich themselves by concealing the fact that they were shipping trucks and trailers across Iran in violation of OFAC regulations including the ITSR and the NAT contract in order to decrease expenses associated with transporting the trucks and trailers to Afghanistan to perform the contract, rather than by shipping the truck and trailers using legal, but more costly, routes. It was a further part of the scheme that the defendants planned to use and deal in the trucks and trailers in the performance of the NAT contract despite the fact that the equipment had become goods of Iranian origin and that Anham's continued dealing in those goods was a violation of OFAC regulations.

## The Scheme and Artifice to Defraud

35.     To obtain the NAT contract, which required the use of heavy trucks and trailers in Afghanistan to move U.S. military vehicles and goods, Anham agreed to abide by OFAC regulations including the ITSR.

36.     To decrease its costs in carrying out the NAT contract, the defendants, ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF, and others, known and unknown to the Grand Jury, illegally shipped the necessary trucks and trailers to Afghanistan through Iran instead of using legal, but more expensive routes, and then concealed this material fact from DLATS and OFAC, located in the District of Columbia. The defendants then used bank accounts held by Anham, including the account that Anham held at Bank of Georgetown in the District of Columbia, to finance the movement of trucks and trailers through Iran.

a.     On or about November 23, 2011, defendant MAZEN FAROUKI emailed another Unitrans executive and a consultant who had worked for defendant Unitrans and asked for a price quote to ship the Mercedes trucks needed for the NAT contract, asking for the "cheapest way even through Iran if necessary."

b.     On or about November 28, 2011, an executive of Unitrans emailed defendants SALAH MAAROUF and MAZEN FAROUKI to inform them that defendant ABUL HUDA FAROUKI wanted certain trucks, needed for the NAT contract, which were to be transported to Afghanistan through Iran.

c.     On or about January 23, 2012, Tracks sought a quote from Transshipper #1 for shipping 25 Mercedes trucks (needed by Anham for the NAT contract) from Kuwait to Kabul, asking for the best mode, either by sea to Bandar Abbas, Iran, or by land all the way to Kabul.

d.      On or about January 30, 2012, Tracks received an email from Transshipper #1 offering to move the 25 Mercedes trucks from Kuwait to Kabul by shipping them to Bandar Abbas and then transporting them through Iran by land. Tracks immediately responded by asking for Transshipper #1's rates.

e.      On or about February 2, 2012, Tracks forwarded three quotes it had received for transportation of the trucks needed for the NAT contract to Anham and Unitrans and defendants MAZEN FAROUKI and SALAH MAAROUF. The quotes included transportation through Iran.

f.      On or about April 17, 2012, the Chief Executive Officer of Tracks informed Transshipper #2 that Tracks had received notice from Anham to proceed with the shipment of the trucks, and that a ship would be arriving in Bandar Abbas, Iran soon with the trucks and requiring Transshipper #2 to be ready to proceed. The message was copied to defendants SALAH MAAROUF and MAZEN FAROUKI.

g.      On or about May 31, 2012, Unitrans paid approximately $250,000 from its PNC Bank account xxxx2942 in the United States to Unitrans Afghanistan's Afghanistan International Bank account xxxx8017 to pay invoice 41064 for expenses relating to the shipment of Anham trucks, trailers, and material handling equipment ("MHE") from Kuwait to Afghanistan which had passed through Iran.

h.      Between May, 2012 and August, 2012, Anham caused Transshipper #2 to ship the trucks and trailers for the NAT contract and approximately four containers of MHE for the SPV-A contract across Iran.

i.      On or about September 12, 2013, D.B., on behalf of Anham, signed a letter submitted to BIS in the District of Columbia. The letter was written after D.B. had learned that the WSJ was preparing a story about Anham's transshipments across Iran. The letter purported to

19

be a voluntary disclosure but claimed that Anham had just learned of the transshipments. In truth and in fact, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF had all known of the transshipments since the initial decision had been made to transport the trucks through Iran.

### COUNT THREE
**Conspiracy to Violate the International Emergency Economic Powers Act (IEEPA)**
**(50 U.S.C. §§ 1705(a) and (c)**

37.     Paragraphs 1-20, 22-31, 34-36, and all subparagraphs contained therein, of this Indictment are re-alleged and incorporated by reference as if set out in full.

38.     Beginning in or around December 2011, and continuing through in or around May 2015, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to: (a) commit offenses against the United States, that is, to export and approve, finance, facilitate, or guarantee the exportation by others of goods, technology or services by a United States person to and through Iran, in violation of the prohibitions imposed upon Iran by the United States Government, without first obtaining the required license from OFAC, located in the District of Columbia, in violation of IEEPA, Title 50, United States Code, Section 1705, 31 C.F.R. Part 544 (also known as the Weapons of Mass Destruction Proliferators Sanctions Regulations (WMDPSR)), 31 C.F.R. Parts 560. 203, 204, 206, 208 and 403, and 31 C.F.R. Part 594 (also known as the Global Terrorism Sanctions Regulations (GTSR));  and (b)  defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of  goods, technology, and services to Iran and other  countries without having first obtained the required license from OFAC,

by deceit, craft, trickery, and dishonest means, all in violation of Title 18, United States Code, Section 371.

## Purpose of the Conspiracy

39.     The purpose of the conspiracy was for Anham and its principals to (1) increase the profit margin that they received on the performance of government contracts, (2) gain a competitive advantage over other contactors bidding on government contracts, and (3) evade the prohibitions of OFAC regulations including the ITSR by concealing that Anham was trans-shipping goods through Iran en route to Afghanistan.

## Manner and Means of the Conspiracy

40.     The manner and means by which the defendants and other conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.     ABUL HUDA FAROUKI and others caused Anham to enter into the SPV-A and NAT contracts, which required Anham to transport goods and materials to Afghanistan.

b.     ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF and others determined that trans-shipping goods and materials through Iran would be cheaper and quicker than using other lawful routes and would therefore increase Anham's chance of being awarded the SPV-A contract and increase its profit margin on the SPV-A and NAT contracts.

c.     ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF and others arranged for Anham and Unitrans to ship goods and materials associated with the SPV-A and NAT contracts to and from Afghanistan via Iran.

d.     ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF, and others arranged for Anham and Unitrans to request quotes from shippers to transport materials for the NAT and SPV-A contracts from Anham's depots and from the vendors' sites to Afghanistan through Bandar Abbas, a port in Iran.

e.    Anham and affiliated companies, including Tracks and Unitrans, entered into contracts with Transshipper #1 and Transshipper #2 for the transportation across Iran of the trucks and trailers and the warehouse components.

f.    ABUL HUDA FAROUKI attempted to conceal Anham and Unitrans's trans-shipments through Iran by falsely representing to DLA officials that Anham and Unitrans did not transship through Iran and, subsequently, by denying to DLA officials that management at Anham was aware of the transshipments.

## Overt Acts in Furtherance of the Conspiracy

41.    In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF and others committed or caused to be committed, the following overt acts:

a.    From in or about January 2012 through in or about March 2012, the defendants caused Anham to ship approximately 45 containers of steel that Anham used to construct the warehouse that Anham described in its bid to win the SPV-A contract to Afghanistan through Iran.

b.    In March 2012, the defendants caused Anham to ship approximately 32 containers of ceiling paneling that Anham used to construct the warehouse that Anham described in its bid to win the SPV-A contract to Afghanistan through Iran.

c.    In May 2012, the defendants caused Anham to ship approximately 4 containers of MHE that Anham used to construct the warehouse that Anham described in its bid to win the SPV-A contract to Afghanistan through Iran.

d.    In May 2012, the defendants caused Anham to ship approximately 52 trucks and trailers to Afghanistan through Iran for use in the performance of the NAT contract.

**COUNTS FOUR THROUGH SEVEN**
**Violation of the International Emergency Economic Powers Act**
**(50 U.S.C. §§ 1705(a) and (c))**

42.     Paragraphs 1-20, 22-31, 34-36, 38-41, and all subparagraphs contained therein, of this Indictment are re-alleged and incorporated by reference as if set out in full.

43.     On or about the dates set forth below, in the District of Columbia, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI and SALAH MAAROUF did willfully export and approve, finance, facilitate, or guarantee the exportation by others of goods, technology or services to and through Iran, without having first obtained the required license from OFAC, located in Washington, D.C., in violation of IEEPA, Title 50, United States Code, Section 1705, 31 C.F.R. Part 544 (also known as the Weapons of Mass Destruction Proliferators Sanctions Regulations (WMDPSR)), 31 C.F.R. Parts 560. 203, 204, 206, 208 and 403, and 31 C.F.R. Part 594 (also known as the Global Terrorism Sanctions Regulations (GTSR)).

| COUNT | DATE OF ENTRY INTO IRAN | NUMBER OF CONTAINERS | DESCRIPTION OF MATERIALS |
|---|---|---|---|
| 4 | 1/14/2012 through 3/14/2012 | 45 | Steel construction materials. |
| 5 | 3/11/2012 through 3/17/2012 | 32 | Ceiling panels. |
| 6 | 5/7/2012 | 4 | Forklifts |
| 7 | 5/7/2012 | 52 | Trucks and trailers |

**COUNT EIGHT**
**Conspiracy to Launder Money**
**(18 U.S.C. §§ 1956(a)(2)(A) and (h))**

44.     Paragraphs 1-20, 22-31, 34-36, 38-41, 43 and all subparagraphs contained therein, of this Indictment are re-alleged and incorporated by reference as if set out in full.

45.     Beginning in or around December 2011 and continuing through in or around September, 2013, within the extraterritorial jurisdiction of the United States and the District of

Columbia, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, and SALAH MAAROUF did knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A) and (h), that is, by transporting, transmitting, and transferring and attempting to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States, that is, Turkey and the UAE, and elsewhere, and by transporting, transmitting, and transferring and attempting to transport, transmit, and transfer, monetary instruments and funds to a place outside the United States, that is Turkey and the UAE and elsewhere, from and through a place inside the United States, with the intent to promote the carrying on of specified unlawful activities, that is, criminal violations of the IEEPA.

### Purpose of the Conspiracy

46.     The purpose of the conspiracy was for Anham to promote the illegal transshipment of goods, equipment, and other materials intended for the SPV-A and NAT contracts through Iran by causing funds from bank accounts held in the United States to be transmitted to entities outside of the United States and from bank accounts outside the United States to bank accounts in the United States.

### Manner and Means of the Conspiracy

47.     The manner and means by which the defendants and other conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.     Defendants caused Anham and its affiliated companies to contract with Transshipper #1 and Transshipper #2 in the U.A.E. and Turkey to transship the warehouse components and the trucks and trailers through Iran to Afghanistan to win or fulfill the SPV-A

and NAT contracts. Defendants caused Unitrans to pay several of the invoices from the shipping companies, to be reimbursed later by Anham.

b.      Unitrans paid Transshipper #1 and Transshipper #2 by wire transfer from its bank in the United States to the accounts of the shipping companies outside the United States.

c.      Defendants caused Anham to reimburse Unitrans for the payments to Transshipper #1 and Transshipper #2. Those repayments were made both from Anham accounts outside the United States to Unitrans accounts inside the United States and from Anham USA accounts in the United States.

d.      Defendants caused Unitrans to wire funds from its bank accounts in the United States to bank accounts of Unitrans Afghanistan outside the United States to promote the furtherance of the shipments of warehouse components and trucks and trailers across Iran to Anham's Bagram warehouse and other Anham facilities in Afghanistan.

## Overt Acts in Furtherance of the Conspiracy

48.      In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, defendants ABUL HUDA FAROUKI, MAZEN FAROUKI, SALAH MAAROUF and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

a.      On or about February 2, 2012, Unitrans wire transferred approximately $51,319 to Transshipper #1, from Unitrans PNC Bank account, number xxxx2942, in the United States to an account in the name of Transshipper #1 at Abu Dhabi Commercial Bank in the UAE. That payment was made to pay Transshipper #1's invoice number 0825 for shipment of five containers from Riyadh, Saudi Arabia to Kabul, via Iran.

b.      On or about February 14, 2012, Unitrans sent its invoice number UNI-0000009107 to Anham seeking reimbursement of the $51,319 it had paid to Transshipper #1.

c.      On or about February 14, 2012, Unitrans sent a wire transfer for approximately $52,876 from its account at PNC Bank in the United States to Transshipper #1's account at Abu Dhabi Commercial Bank in the UAE to pay an invoice for the shipment of five additional containers from Riyadh, Saudi Arabia to Bandar Abbas, Iran, en route to Afghanistan.

d.      On or about February 14, 2012, Unitrans sent its invoices numbered 9108 and 9111 to Anham for reimbursement for the amount of $52,876 Unitrans had sent to Transshipper #1.

e.      On or about February 23, 2012, Unitrans paid approximately $34,121 from its PNC Bank account xxxx2942 in the United States to Unitrans Afghanistan's Afghanistan International Bank account xxxx8017 to pay invoice 40929 dated January 12, 2012 for expenses relating to the continued shipment of 9 containers of Anham items from Saudi Arabia to Afghanistan which had already passed through Iran.

f.      On or about March 27, 2012, Unitrans paid approximately $20,600 from its PNC Bank account xxxx2942 in the United States to Unitrans Afghanistan's Afghanistan International Bank account xxxx8017 to pay invoice 40991 dated March 23, 2012 for expenses relating to the continued shipment of 7 containers of Anham items from Saudi Arabia to Afghanistan which had already passed through Iran.

g.      On or about April 11, 2012, Unitrans transferred approximately $112,840 from its PNC Bank account xxxx2942 in the United States to Transshipper #2's bank account in Istanbul, Turkey for part of the shipment of 13 containers with steel components for the Bagram warehouse which had been transshipped across Iran. The payment was in response to invoices

from Transshipper #2 to Unitrans. Unitrans sent multiple invoices to Anham seeking reimbursement for the payments to Transshipper #2.

h.     On or about April 23, 2012, Anham transferred approximately $148,775.93 from its account at the Abu Dhabi Islamic Bank, U.A.E, to Unitrans's account number xxxx2942 at PNC Bank in the United States, following an email on the previous day from the Chief Financial Officer of Anham to executives at Unitrans, AIS, Anham and Anham USA, including defendants MAZEN FAROUKI and SALAH MAAROUF, showing that the payment constituted reimbursement to Unitrans for expenses Unitrans had incurred in organizing and administering the shipment of warehouse components for Anham through Iran.

i.     On or about April 9, 2012, Unitrans ordered its bank, PNC, in the United States, to request a payment of approximately $306,114.34 pursuant to a letter of credit at Arab Bank. On the same day, payment on the letter of credit in the requested amount was approved by a Managing Director and partial owner of Anham.

j.     On or about April 30, 2012, Unitrans received $306,114.34 in its PNC bank account in the United States from the Arab Bank in Bahrain.

k.     On or about May 30, 2012, the Chief Financial Officer of Anham emailed Anham and Anham USA employees instructing them to pay $376,714.19 to Unitrans to reimburse Unitrans for its expenses in shipping the warehouse components from Saudi Arabia to Afghanistan which had already passed through Iran.

l.     On that same day, Anham paid approximately $376,714.19 to Unitrans's PNC account xxxx2942 from its Bank of Georgetown account in Washington, D.C.

m.     On or about May 31, 2012, Unitrans paid approximately $250,000 from its PNC Bank account xxxx2942 in the United States to Unitrans Afghanistan's Afghanistan

International Bank account xxxx8017 to pay invoice 41064 for expenses relating to the shipment of Anham trucks, trailers, and MHE equipment from Kuwait to Afghanistan which had been transshipped through Iran.

n.      On or about October 23, 2012, Anham wire transferred approximately $388,659.80 from account number xxxx8387 at Abu Dhabi Islamic Bank, UAE to Unitrans's account xxxx2942 at PNC Bank in the United States. At least $85,000 of that amount was related to the transportation of components or equipment related to the SPV-A contract.

o.      On or about November 16, 2012, Anham wire transferred approximately $15,455 from its account number xxxx7801 at Emirates NBD Bank, Dubai, U.A.E., to Unitrans's account number xxxx2942 at PNC Bank in the United States. The payment was to reimburse Unitrans for payments made for part of the costs of shipping four containers of MHE to Bagram, Afghanistan, through Iran, for use in performing the SPV-A contract.

p.      On or about January 3, 2013, the Chief Financial Officer of Anham instructed Anham and Anham USA employees to pay a total of $217,125.84 to Unitrans for its invoices 256 and 256-A, submitted to Tracks for Unitrans' expenses in shipping Anham trucks, trailers, and other equipment from Kuwait to Afghanistan through Iran.

q.      On that same day, Anham paid the invoices by transferring approximately $217,125.84 from its Bank of Georgetown Account in Washington, DC, to Unitrans's PNC account xxxx2942.

### FORFEITURE ALLEGATION

49.     Upon conviction of any of the offenses alleged in Counts One and Two, the defendants shall forfeit to the United States any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of those violations.,

pursuant to 18 U.S.C. § 982(a)(3). The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which is derived from these offenses.

50.     Upon conviction of any of the offenses alleged in Counts Three through Seven, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of those offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

51.     Upon conviction of the offense alleged in Count Eight, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, involved in this offense, or any property traceable to such property.

52.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be divided without difficulty;

f.      the defendant shall forfeit to the United States any other property of the

defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28,

United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

A TRUE BILL

_____

FOREPERSON

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By:      _____
         JAMES J. GELBER
         TRIAL ATTORNEY, FRAUD SECTION

    f.      the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By: _____
JAMES J. GELBER
TRIAL ATTORNEY, FRAUD SECTION